UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| John Manchin, III, *doing business as* Manchin Family Pharmacy, and *doing business as* The Drug Store,<br><br>Plaintiff,<br><br>v.<br><br>QS/1 Data Systems, *a Division of JM Smith Corporation, a South Carolina corporation*<br><br>Defendant. | C/A No.: 7:13-cv-02188-GRA<br><br>**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

This matter is before the Court on Defendant QS/1 Data Systems' Motion for Summary Judgment. ECF No. 75. This motion has been fully briefed by the parties and a hearing was held on June 23, 2014. *See* ECF Nos. 75, 76, 79, 89, 90 & 93. After reviewing the parties' submissions and hearing the arguments of counsel, this Court makes the following findings of facts and conclusions of law.

## Background

This case was transferred to this Court from the Northern District of West Virginia on August 13, 2013. ECF No. 32. On February 2, 2013, Plaintiff John Manchin, III, doing business as the Manchin Family Pharmacy and The Drug Store, (hereinafter, "Manchin") filed an Amended Complaint against Defendant QS/1 Data Systems (hereinafter, "QS/1"), alleging causes of action for Negligence/Negligent Misrepresentation, Breach of Contract (including implied covenants of good faith and fair dealing), Breach of Express Warranties, Breach of the Implied Warranty of Merchantability, and Breach of the Express Warranty of Fitness for a Particular

Purpose. ECF No. 65. Manchin and QS/1 entered into agreements in 2008, pertaining to Manchin's purchase of QS/1's pharmacy management software called NRx and its accompanying services, which Manchin would use in two of his pharmacies, the Manchin Family Pharmacy and The Drug Store, located in West Virginia. ECF No. 65 at 3. Manchin provided documentation from QS/1 showing that the software was advertised by QS/1 to be able to: help obtain "elusive profit margins"; be "easy to use"; "provide comprehensive management tools necessary for better profitability;" serve as the "complete and intuitive pharmacy management system." ECF Nos. 79-1 & 79-2. QS/1 has acknowledged it marketed the NRx system for making money and enhancing profit. ECF No. 79-3. Manchin has provided evidence that based on these representations he signed sales and licensing agreements with QS/1 for the NRx software (hereinafter, collectively, the "Licensing Agreements"). *See* ECF Nos. 65 at 3, 76-3, 76-5, 79-4, 79-12, 89-1, & 89-2. QS/1 posits that these agreements are its only agreements with Manchin because the Licensing Agreements incorporate the agreements providing for a selection of services. ECF No. 89. However, Manchin has provided evidence that he separately entered services agreements with QS/1 that contemplated and included separate consideration. *See* ECF Nos. 65 at 3, 79-5, 79-8, 89-3, & 89-4.

    Manchin argued in his Memo in Opposition to QS/1's Motion for Summary Judgment, and at the hearing, that the services agreements form the basis of his Complaint against QS/1. QS/1 documents accompanying the services represented that the services could "increase productivity and profitability with optional products and services," including "PowerLine" and "Price updates." ECF Nos. 79-6 & 79-7.

QS/1 represented that the PowerLine service would: automatically update drug costs and records "during transmission to reduce lost profitability;" "alert you to errors providing the opportunity to correct them before your claims are even submitted;" and "automatically update drug price during transmission to maximize pharmacy profit." ECF No. 79-6.  QS/1 represented that the "Price Updates" service would: "protect your bottom line;" and "automatically update data including, manufacturers, package sizes, competitive pricing, MAC pricing, net wholesale acquisition and state codes." ECF No. 79-7.

Manchin paid the additional funds and contracted with QS/1 for the PowerLine service and the Price Update service.  ECF No. 79-8.  This weekly electronic price update was based on average wholesale price or ("AWP").  ECF No. 79-9.  Manchin provided evidence that he and his pharmacy staff members completely relied on QS/1 for everything including all setup, all updates, and the ability to perform the services as represented.  ECF No. 79-10.  Manchin provided evidence that QS/1 admitted that it would be fair for the pharmacies to rely on the descriptions and definitions of the PowerLine and Price Update services provided by QS/1 in these marketing materials.  ECF No. 79-11.

Manchin provided evidence that by late January or early February of 2009, staff members at the Manchin Family Pharmacy and The Drug Store were calling the QS/1 help line about problems in pharmacy cash flow that could not be traced.  ECF No. 79-14.  The documents reflect that different technician answered nearly every time the pharmacy staff members called.  *Id.*  Manchin has provided evidence from QS/1 documentation that the actual problem was identified in November of 2009 by

QS/1 technician LaToya Smith and then repaired by QS/1.  ECF No. 79-16.  Manchin alleges that QS/1 failed to properly provide price update services, and that the hardware and software sold and installed by QS/1 did not operate in accordance with the parties' agreements and QS/1's representations.  ECF Nos. 65 at 5–6 & 79 at 7.  Manchin maintains that the initial trainer for QS/1 allegedly failed to set up a price table for both the Manchin Family Pharmacy and The Drug Store to "bill the maximum rate to insurance companies based on a formula called average wholesale price ("AWP")."  ECF No. 79 at 4.  Manchin alleges that this error constituted breach of the services agreement, negligence/negligent misrepresentation, and breach of warranty causing damages, and resulting in a loss of revenue during that non-AWP billing time period between $300,000.00 and $1,200,000.00.  *Id.*

In accordance with this Court's fourth Amended Scheduling Order, QS/1 filed the instant motion on May 15, 2014, after discovery in this case ended, requesting that this Court grant summary judgment in its favor.  ECF Nos. 61 & 75.  QS/1 grounds its Motion for Summary Judgment on provisions in the Licensing Agreements placing responsibility on Manchin for the accuracy of information in the NRx system, including establishing prices, limiting QS/1's liability, and disclaiming warranties.  ECF No. 75 at 6–22.  In addition, QS/1 asserts that Manchin's claims of negligence and negligent misrepresentation are barred by the economic loss rule, that the record is void of any misrepresentations made by QS/1, and that Manchin has not suffered any compensable personal injury.  *Id.* at 22–25.

On June 2, 2014, Manchin responded in opposition contending that his claims are based on QS/1's failure to properly provide price update services as set forth in

the service agreements. ECF No. 79. Manchin asserts that summary judgment should be denied because the Licensing Agreements are separate from the services agreements, the South Carolina Uniform Commercial Code ("UCC") does not apply because this case involves services rather than goods, the breach of an industry standard prevents application of the economic loss rule, and Manchin and his agents relied on QS/1's representations for everything it purchased. *Id.* On June 12, 2014, QS/1 filed a Reply arguing that summary judgment should be granted, and in support argued that the parties entered into only two separate agreements because the Licensing Agreements afforded Manchin access to and referenced the services listed on the services selection documents, that the South Carolina UCC applies to this case because the contracts involve goods with services incidentally involved, and that the breach of an industry standard exception to the economic loss rule is not applicable to the facts of this case. ECF No. 89.

## Standard of Review

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to grant summary judgment, the Court must "view the evidence in the light most favorable to the nonmoving party." *Yarnevic v. Brink's, Inc.*, 102 F.3d 753, 756 (4th Cir. 1996). The Court is not to weight the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Therefore, in order to avoid summary judgment, issues of fact that are "genuine" and "material" must exist. An issue of fact is "material" if establishing that fact might affect the

outcome of the case.  *Wilson Group, Inc. v. Quorom Health Res., Inc.*, 880 F. Supp. 416 (D.S.C. 1995).  An issue of material fact is "genuine" in the case "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" meaning that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248.  However, all doubts must be resolved and all justifiable inferences must be drawn in favor of the nonmoving party.  *See Yarnevic*, 102 F.3d at 756.

## Discussion

**I.     Arguments under the Licensing Agreements**

This Court finds that the operative documents in this case are not the Licensing Agreements, but rather the separate agreements by which QS/1 was obligated to provide PowerLine and Price Update services in a manner consistent with the description of these services as defined in QS/1's own materials.  Manchin provided testimony from QS/1's own witness that the contracts are separate and make no reference to one another.  *See* ECF No. 79-27.  Accordingly, the language in the Licensing Agreements attempting to absolve QS/1 of responsibility and limit its liability is inapplicable because the agreements are separate from the contracts for the provision of services.  Therefore, summary judgment is improper on this issue.

Even assuming *arguendo* that the limitation of liability clause were to apply to the services selection agreement Manchin alleges was breached, the clause would

still be unenforceable under South Carolina law.  Limited liability provisions are disfavored under South Carolina law as they tend to encourage a lack of due care and courts therefore strictly construe such provisions against the party seeking to limit the liability for its own wrongdoing.  *See Pride v. S. Bell Tel. & Tel. Co.*, 138 S.E.2d 155, 156–57 (S.C. 1964); *McCune v. Myrtle Beach Indoor Shooting Range, Inc.*, 612 S.E.2d 462, 464–67 (S.C. App. 2005).  Strictly construing the liability waiver against QS/1, the waiver is unenforceable because the waiver is unconscionable and against South Carolina public policy.  Thus, the UCC provisions cited by QS/1 are inapplicable because this case is primarily about QS/1's failure to properly provide services, for which Manchin paid and from which Manchin failed to benefit.  *See Ranger Constr. Co. v. Dixie Floor Co.*, 433 F.Supp. 442, 445 (D.S.C. 1977) (finding that the UCC is inapplicable if the predominant factor of the transaction is the rendition of a service with goods incidentally involved).  The contracts Manchin alleges QS/1 breached are for the provision of services.  Thus, the proper citation is to South Carolina common law.

The factors considered by the courts construing liability limitation provisions are as follows: (1) was there a meaningful choice available or were these types of limitation provisions industry-wide leaving the consumer no real option; (2) were the terms of the liability limitation such that that no reasonable person would make them and no fair and honest person would accept them; (3) were the terms obscured in any way or inconspicuous; (4) was there equality of bargaining power; and (5) was the agreement the result of negotiation between the parties or was it a take it or leave it

agreement.  *See Gladden v. Boykin*, 739 S.E.2d 882 (S.C. 2013).  Applying these factors in the case at bar, the liability limitation provision is unenforceable.

QS/1's witnesses testified that there was no meaningful choice to Manchin as every software contract in this industry includes a limitation of liability provision like the one included in QS/1's Licensing Agreements.  Thus, contrary to *Gladden* in which there was "no record on which to find that . . . contracts without exculpatory clauses are unavailable in that market," 739 S.E.2d at 885, the record in this case shows that contracts without exculpatory clauses are unavailable in this market.  Thus, the first factor weighs against enforcement of the liability waiver.

The terms of the limitation are such that no reasonable person would make them.  Manchin put his business in the hands of QS/1's services provision team.  This business included thousands of transactions and millions of dollars in sales done by both pharmacies.  No reasonable person would agree to risk losing millions of dollars with the only recourse against the service company a recovery of only thousands.  Thus, the second factor weighs against enforcement of the liability waiver.

The terms of the liability limitation were placed directly below an all bold, all capitalized warranty limitation paragraph and thereby significantly obscured as the natural tendency of the eye is to go toward the bold and all capitalized language.  Further, the fine print form is nearly illegible without a magnifying glass even on the document produced with QS/1's bates stamp.  Thus, the third factor weighs against enforcement of the liability waiver.

There was a great inequality of bargaining power in this case.  Manchin operates a family pharmacy in small town West Virginia with only two locations, one

of which is in a town with a population of only 300.  QS/1 is a division of JM Smith, which is a much larger business with revenue many times larger than Manchin's revenue on a yearly basis.  There is a significant inequality of bargaining power between the two entities.  Thus, the fourth factor weighs against enforcement of the liability waiver.

As to the final factor, the agreements between QS/1 and Manchin were not subject to any negotiation of any of the written terms and there was not any discussion between the parties regarding the liability limitation provisions.  *See* ECF No. 79-29.  Thus, the fifth factor weighs against enforcement of the liability waiver.

For these reasons the liability limitation clause is inapplicable in this case.  Additionally, and for the same reasons, the warranty limitation in the License Agreements is inapplicable.

## II.     Arguments as to the Negligence Claims

Manchin provided evidence of testimony from one of its agents who testified that she completely relied on QS/1 for everything, including all updates, initial setup, and continuing setup.  ECF Nos. 79-33 & 79-34.

Manchin argued in his filings and at the hearing that under South Carolina law, the breach of an industry standard prevents the application of the economic loss rule.  However, QS/1 argues that the South Carolina Supreme Court in *Sapp v. Ford Motor Company*, 687 S.E.2d 47, 51 (S.C. 2009), settled the issue relating to the "breach of industry standards" exception to the economic loss rule by confirming that this exception applies narrowly and only in the residential home construction context.  ECF No. 89 at 6.

Accordingly, construing all evidence and inferences therefrom in the light most favorable to Manchin, this Court finds that the duties among the parties were created solely by contract, and thus, summary judgment is granted as to the negligence-based claims.  *See Sapp*, 687 S.E.2d at 50 (indicating courts should be cautious to permit negligence actions "where there is neither personal injury nor property damage").

### III.     Non-Economic Damages

QS/1's Motion for Summary Judgment is granted as to the non-economic/personal injury damages sought by Manchin.  Manchin has not shown any evidence of any personal injury damages and therefore QS/1's Motion is granted on that issue.

### Conclusion

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment is GRANTED in Part and DENIED in Part.

**IT IS FURTHER ORDERED** that the parties shall attend a second mediation in this case no later than July 7, 2014.

**IT IS SO ORDERED**.

*[signature]*

G. Ross Anderson, Jr.
Senior United States District Judge

July _1_, 2014
Anderson, South Carolina